UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

ANTOINE STEWART,                          :

                         Movant,         :      08 Civ. 7514 (RO)(HBP)

        -against-                        :      REPORT AND
                                                RECOMMENDATION
UNITED STATES,                           :

                         Respondent.     :

-----------------------------------X


            PITMAN, United States Magistrate Judge:


            TO THE HONORABLE RICHARD OWEN, United States District

Judge,


I.   Introduction


            Antoine Stewart, proceeding pro se, moves pursuant to

28 U.S.C. § 2255 to vacate, set aside or correct a judgment of

conviction imposed on June 28, 2006, after a jury trial, by the

United States District Court for the Southern District of New

York (Preska, D.J.).  Petitioner was convicted of conspiracy to

commit murder in aid of racketeering in violation of 18 U.S.C. §

1959(a)(5); murder in aid of racketeering in violation of 18

U.S.C. §§ 1959(a)(1) and 2; conspiracy to distribute at least

fifty grams of crack cocaine in violation of 21 U.S.C. § 846;

murder in connection with a narcotics conspiracy in violation of

21 U.S.C. §§ 848(e)(1)(A) and 18 U.S.C. § 2; discharge of a firearm in connection with a narcotics conspiracy in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2; and murder with a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(j) and 2.  See United States v. Stewart, 280 F. App'x 44, 45 (2d Cir. 2008).  For these crimes, petitioner was sentenced to a term of life imprisonment plus ten years.

Petitioner now claims that his sentence should be vacated or modified because did not receive the effective assistance of counsel during pre-trial proceedings, at trial and on appeal (Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person In Federal Custody, dated July 5, 2008 (Docket Item 1 in 08 Civ. 7514)("Petition"), at 5, 5A-5D).  For the reasons set forth below, I respectfully recommend that the petition be denied in all respects.

II.  Facts

    A.  Facts Leading to
        Petitioner's Conviction

Petitioner's conviction arises out of his involvement with "The Westchester Avenue Crew," a gang that sold drugs in the Bronx, and the murder-for-hire of a rival drug dealer.  The evidence offered at trial established the following facts.

The Westchester Avenue Crew began operating in 1999 when Gamaliel Gonzalez and Christian Barragan started selling drugs together (Tr.[1] 136).  The gang, which operated out of the Saint Mary's Park Houses on Westchester Avenue in the Bronx, chiefly sold crack cocaine.  In January 2001, Barragan was arrested in a police raid and pleaded guilty to state drug charges (Tr. 158-60).  While in state custody from January of 2001 through February of 2003, Barragan continued to receive money from the Westchester Avenue Crew, communicate with Gonzalez and direct the activities of the organization (Tr. 90-91).

In 2001, William Ragland started his own drug-selling enterprise out of the John Adams Houses, which were in proximity to the Saint Mary's Park Houses.  Ragland started "closing people down, closing other spots down" through the use of "threats and other pressure tactics" (Tr. 168-69).  When Barragan learned of Ragland's growing influence, he told Gonzalez to "handle it before it becomes a problem," by which he meant that Gonzalez should meet with Ragland before Ragland won a large share of the market (Tr. 169).

On July 11, 2002, a "hysterical" Gonzalez reported to Jerald Benton and Michelle Farias, two other members of the

_____

[1] "Tr." refers to the trial transcript.

Westchester Avenue Crew, that Ragland's workers had threatened Kevin Garner, another crew member, with baseball bats and told Garner that they were going to sell crack in the St. Mary's Houses (Tr. 387-88, 828-29).  After Gonzalez and Benton consulted with Garner, Gonzalez asked Benton whether he knew anyone willing to "put in some work," with respect to Ragland, by which he meant to kill him (Tr. 829-30).

Benton contacted Gregory Harris, an acquaintance he had met while serving time in prison; Harris soon met with Benton, accompanied by Steven Austin (Tr. 780, 831-33, 1054).  Gonzalez, Benton, Harris and Austin all traveled to the John Adams Houses to meet with Ragland (Tr. 836).  Benton spoke with Ragland and brokered a truce in which Ragland agreed not to sell crack in the St. Mary's Houses during Gonzalez's shift (837-38).  When Benton explained the truce to Gonzalez, Gonzalez told him that Garner was likely to be dissatisfied, since the agreement provided that Ragland could still sell crack during Garner's shift (Tr. 839).  Gonzales again asked Benton whether he knew anyone willing to kill Ragland (Tr. 839).  Benton asked Austin if he would kill Ragland, but Austin refused (Tr. 839).

When Gonzalez explained the agreement with Ragland to Garner, Garner became infuriated (Tr. 841).  Garner approached Ragland's workers and cursed at them (Tr. 841).  Soon, Ragland

arrived on a motorized scooter (Tr. 841).  Ragland told Benton
that "all bets [were] off" with respect to the truce (Tr. 841-
42).  Gonzalez and Garner again asked Benton if he knew someone
willing to kill Ragland (Tr. 842).  Benton again called Harris,
and asked to speak with petitioner (Tr. 842-43).[2]  Benton asked
petitioner if he would be interested in "putting some work in for
some people that I knew that needed a favor," and petitioner
responded that he would "think about it" (Tr. 843-44).  Later
that day, petitioner arrived at the St. Mary's Park Houses, and
Benton introduced him to Gonzalez and Garner (Tr. 844-45).
Gonzales, Garner and petitioner then had a discussion and shook
hands (Tr. 845).  Gonzalez attempted to point out Ragland to
petitioner but was unsuccessful (Tr. 186).  Gonzalez arranged to
have another member of the Westchester Avenue Crew, Derrick
Johnson, identify Ragland for petitioner at an opportune moment
(Tr. 186-87).

Benton met Garner later in the evening of July 11, 2002
at the St. Mary's Park Houses (Tr. 346).  Garner told Benton that
petitioner was en route, and gave Benton a gun wrapped up in

---

[2] Petitioner met Benton in 2000 through Harris, and Benton
had seen petitioner between ten and fifteen times in the
intervening period (Tr. 818-19).  According to Benton, petitioner
and Harris sold crack together as part of a separate operation
located in the Murphy Consolidated Houses, also in the Bronx (Tr.
819-21).

cloth to give to petitioner (Tr. 346-47).  Benton met petitioner at 665 Westchester Avenue and gave petitioner the gun (Tr. 847). However, less than an hour later, petitioner returned the gun to Benton, stating that he had been unable to find Ragland (Tr. 849-50).  Benton relayed this development to Garner and also returned the gun to Garner (Tr. 850).

Several minutes later, Ragland appeared at the St. Mary's Park Houses (Tr. 851).  Garner asked Benton to locate petitioner, and Benton motioned in the direction that petitioner had departed to Johnson, who set out to locate petitioner on a bicycle (Tr. 850-51).  Farias testified that before Johnson left on the bicycle, Garner gave him the gun (Tr. 391).

Approximately twenty minutes later, Benton and Farias heard gunshots coming from the direction of the John Adams Houses followed by screams (Tr. 393, 854).  An eyewitness to the shooting, who had been sitting and speaking with Ragland and another individual at the John Adams Houses, testified that a man in a hooded sweatsuit approached Ragland, asked him a question and then immediately fired "about five" shots at Ragland at a close range (Tr. 696-700).  The eyewitness, who was five feet, four inches tall, further testified that the shooter was "[a] little taller" than her (Tr. 700-01).

After the shooting, Benton, Farias, Johnson and Garner traveled by car to Gonzalez's house, which was approximately ten minutes away (Tr. 401, 855).  After Garner engaged in a "heated" discussion with Gonzalez, the group went to the Crown Donuts Diner to meet up with petitioner (Tr. 402, 863-64).  Soon after the group reached the diner, petitioner arrived on foot, "very hyper," "[j]ittery," and "excited" (Tr. 403, 865).  Gonzalez and Garner spoke with petitioner, Garner handed petitioner $500, and petitioner left (Tr. 404, 866).  Gonzales then remarked to Benton that "your boy put that work in," indicating that petitioner had killed Ragland (Tr. 866-67).

In August 2002, Benton again saw petitioner at the St. Mary's Houses (Tr. 870).  Petitioner informed Benton that Gonzalez and Garner still owed him money for "taking care of the situation" (Tr. 870).  Benton took petitioner to one of the Westchester Avenue Crew's stash apartments and gave petitioner approximately 20 grams of heroin to cover what was owed to petitioner (Tr. 870-73).

Additional evidence showed that petitioner continued to associate with Gonzalez after Ragland's murder, until Gonzalez himself was murdered in October 2002 (Tr. 188-190, 1177-80).  Gonzalez's cell phone, recovered by law enforcement, had

petitioner's telephone number stored under the name "Killer" (Tr. 1088).

In 2003, petitioner, who was then awaiting trial on gun-related charges,[3] encountered Barragan at the Metropolitan Detention Center in Brooklyn, New York (Tr. 188-89).  Petitioner told Barragan that he had known Gonzalez, and that he also knew other members of the Westchester Avenue Crew (189-90). Petitioner also told Barragan that he had done "a couple of jobs" with Gonzalez, including a robbery (Tr. 190).  With respect to Ragland, petitioner told Barragan "[t]hat was [his] work," and described the events surrounding the shooting (Tr. 191). Petitioner told Barragan that "[h]e had gotten somebody, another party that was about to be incarcerated" to do the shooting, and that he had been the driver (Tr. 191-93).[4]

Petitioner was charged with Ragland's murder in an indictment filed on August 5, 2004 (Docket Item 83 in 02 Cr. 1435).  Garner, Benton and Johnson were also charged with Ragland's murder, and each pled guilty (Memorandum of Law in

---

[3] On October 7, 2002, petitioner was arrested for possession of a firearm with an obliterated serial number (Tr. 1060).  On May 6, 2003, he was convicted of being a felon in possession of a firearm (Tr. 1060).

[4] Evidence showed that Austin surrendered to serve a prison sentence at Rikers Island on July 24, 2002, less than two weeks after Ragland's shooting (Tr. 1059).

Opposition to Antoine Stewart's Petition Pursuant to 28 U.S.C. 2255, dated Dec. 10, 2008 (Docket Item 296 in 02 Cr. 1435)("Resp. Memo."), at 5).  Barragan, Farias and Benton agree to cooperate and testified against petitioner at his trial (Resp. Memo. at 5). The prosecution also called as witnesses an eyewitness to the Ragland's shooting, several law enforcement officers, a medical examiner, a ballistics expert, employees of Dollar Rent-a-Car, Verizon and Nextel.

Petitioner called one witness in his defense, a detective who interviewed the eyewitness on the night of the shooting (Tr. 1103).  The detective stated that the eyewitness told him that the shooter was approximately five feet, ten inches tall (Tr. 1104-05).  When cross-examined, the detective admitted that the eyewitness had given him "a range of what the height was," and he had written down five feet, ten inches (Tr. 1107). Petitioner's actual height was five feet, six inches (Tr. 712-13).

The jury returned a verdict on February 10, 2006 convicting petitioner all counts (Tr. 1347-49).  On June 23, 2006, petitioner was sentenced to a term of life imprisonment plus ten years.

B.    Petitioner's Direct Appeal

Petitioner raised three arguments on his direct appeal:
(1) there was insufficient evidence to convict him of a
conspiracy to distribute narcotics, (2) the Trial Court
incorrectly admitted evidence of his prior crimes and bad acts,
and (3) the Trial Court improperly refused to give the jury a
"multiple conspiracy charge." United States v. Stewart, supra,
280 F. App'x at 45 (2d Cir. 2008).  On May 29, 2008, the Court of
Appeals rejected all of petitioner's arguments and affirmed his
conviction.  United States v. Stewart, supra, 280 F. App'x at 47.

C.   The Instant Petition

Petitioner timely filed the present petition seeking to
vacate, set aside or correct his sentence.  He argues that he was
denied the effective assistance of counsel in a number of differ-
ent ways:  (1) trial counsel did not object to certain testimony
given by law enforcement officers, the substance of which con-
tained information obtained in violation of petitioner's Miranda
rights, (2) trial counsel failed to investigate and present
certain allegedly exculpatory evidence, (3) trial counsel failed
to advise petitioner as to whether he should have accepted the
government's plea agreement, (4) appellate counsel failed to

10

argue on appeal that the Trial Court's denial of a continuance was erroneous; (5) appellate counsel failed to argue on appeal that certain trial testimony given by one of petitioner's co-conspirators was inadmissible hearsay, (6) appellate counsel failed to argue on appeal that cross-examination of a cooperating witness was improperly restricted by the Trial Court, and (7) appellate counsel failed to apply for a writ of certiorari (<u>see</u> Petition at 5A-5D; Motion for Leave to Amend Motion Under 28 U.S.C. Section 2255, dated Jan. 29, 2009 (Docket Item 295 in 02 Cr. 1435)("Pet. Amend."), at 1-2).

III.   <u>Analysis</u>

    A.   Petitions Under
       <u>28 U.S.C. § 2255</u>

    A prisoner in federal custody may move a court to vacate, set aside or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without juris-diction to impose such a sentence, or that sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  "Because collateral challenges are in 'tension with society's strong interest in the finality of criminal convictions, the courts have established

rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" <u>Yick Man Mui v. United States</u>, 614 F.3d 50, 53 (2d Cir. 2010), <u>quoting</u> <u>Ciak v. United States</u>, 59 F.3d 296, 301 (2d Cir. 1995), <u>abrogated on other grounds by</u> <u>Mickens v. Taylor</u>, 535 U.S. 162 (2002).

B.  Ineffective
    <u>Assistance of Counsel</u>

1.  <u>Applicable Law</u>

In order to prevail on an ineffective-assistance-of-counsel claim, a habeas petitioner must meet the now-familiar, two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 686-87 (1984).

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
>
>                             . . .
>
> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.  Unless a defendant makes both

> showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

Accord Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005); Aeid v. Bennett, 296 F.3d 58, 62-63 (2d Cir. 2002); Hernandez v. United States, 202 F.3d 486, 488 (2d Cir. 2000); Hurel-Guerrero v. United States, 186 F.3d 275, 281-82 (2d Cir. 1999); McKee v. United States, 167 F.3d 103, 106-07 (2d Cir. 1999); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998).  This same standard applies to claims of ineffective assistance of appellate counsel. Smith v. Robbins, 528 U.S. 259, 285-86 (2000); Blalock v. Fisher, 480 F. App'x 39, 40-41 (2d Cir. 2012); Mercer v. Herbert, 133 F. Supp. 2d 219, 238 (W.D.N.Y. 2001) ("A claim for ineffective assistance of appellate counsel is evaluated upon the same standard as is a claim of ineffective assistance of trial counsel.").  See also Morales v. United States, 635 F.3d 39, 43 (2d Cir. 2011); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

In determining whether counsel's performance was objectively deficient, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland v.

13

_Washington_, _supra_, 466 U.S. at 689 (internal quotation marks omitted).

In the appellate context, "it does not suffice 'for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument.'" _McKee v. United States_, _supra_, 167 F.3d at 106, quoting _Mayo v. Henderson_, _supra_, 13 F.3d at 533; see also _Tatum v. Lempke_, 481 F. App'x 659, 663 (2d Cir. 2012). "Rather, it is the hallmark of effective appellate advocacy to choose wisely which claims are brought on appeal." _Fletcher v. Mann_, 956 F. Supp. 168, 173 (N.D.N.Y. 1997) (internal quotation marks omitted). Thus,

> [i]n assessing the reasonableness of the arguments posed on appeal versus other possible nonfrivolous arguments, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. . . . Generally, only when ignored issues "are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."

_Larrabee v. Smith_, 14 F. Supp. 2d 235, 239 (N.D.N.Y. 1998), quoting _Mayo v. Henderson_, _supra_, 13 F.3d at 533; see _Torres v. Irvin_, 33 F. Supp. 2d at 257, 266 (S.D.N.Y. 1998) (Cote, D.J.).

Because the test is conjunctive, a habeas petitioner's failure to satisfy either prong requires that the challenge to the conviction be rejected. _Strickland v. Washington_, _supra_, 466 U.S. at 697.

14

2.   Petitioner Received
     Effective Assistance of Counsel

     a.   Trial Counsel's
          Alleged Ineffectiveness

          i.   Testimony Regarding
               Petitioner's Height

Petitioner first argues that his trial counsel was ineffective for failing to object when several police officers testified about his reported height (Petition at 5C).

New York City Police Officers Alex Trisano, Jose Torres and Drug Enforcement Administration Special Agent Joseph Mercurio each interviewed petitioner on different occasions after he was arrested (Tr. 709-13, 1062-66, 1068-74).   Trisano testified that petitioner told him that his height was five feet, two inches on August 15, 2002; Torres testified that petitioner told him that his height was five feet, three inches on October 11, 2002; Mercurio testified that petitioner told him that his height was five feet, three inches on September 27, 2004 (Tr. 709-13, 1062-66, 1068-74).   In truth, petitioner's height was five feet, six inches (Tr. 712-13).

Petitioner argues that "[t]rial counsel should have known that he was required to object to such testimony because

there was no showing of compliance with the petitioner's <u>Miranda</u> rights" (Petition at 5C). Because it appears that petitioner did not make a pre-trial motion to suppress the officers' statements, the record does not disclose whether or when petitioner received <u>Miranda</u> warnings. Nevertheless, petitioner's argument has no merit.

"The collection of biographical or pedigree information through a law enforcement officer's questions during the non-investigative booking process that typically follows a suspect's arrest . . . does not ordinarily implicate the prophy-lactic protections of <u>Miranda</u>, which are designed to protect a suspect only during investigative custodial interrogation." <u>Rosa v. McCray</u>, 396 F.3d 210, 221 (2d Cir. 2005); <u>see also</u> <u>United States v. Augustus</u>, 10-CR-629 RRM, 2012 WL 3241190 at *6-*8 (E.D.N.Y. Aug. 6, 2012); <u>United States v. Owens</u>, 08 Cr. 534 (CM), 2008 WL 4865205 (S.D.N.Y. Nov. 7, 2008) (McMahon, D.J.).

Here, each officer's testimony clearly indicates that petitioner's height information was gathered as a routine compo-nent of the booking process, and not as a result any type of custodial interrogation. Thus, even if petitioner had not been given <u>Miranda</u> warnings prior to his statements, the pedigree exception to <u>Miranda</u> is clearly applicable to the height-related statements elicited by the officers. The fact that petitioner's

16

consistent understatements of his height were later used by the prosecution as evidence of his consciousness of guilt does not alter this outcome.  Rosa v. McCray, supra, 396 F.3d at 21 (2d Cir. 2005)("Whether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of Miranda.").

Because any objection to the officers' height-related testimony would have been futile, I conclude that this aspect of petitioner's ineffective assistance of counsel claim is meritless.

### ii.  The Traffic Ticket

Petitioner next argues that his trial counsel was ineffective for failing to present evidence relating to a traffic ticket allegedly received by petitioner on the night of the murder (Pet. Amend. at 1).

Petitioner states that he "told trial counsel prior to trial that he received a traffic ticket which showed that he was detained at a police check point during the time frame that the Ragland murder occurred" (Pet. Amend. at 1).  According to petitioner, investigation of this traffic ticket would have

demonstrated that (1) his "presence as a driver in the vehicle" conflicted with testimony of government witnesses, who stated that petitioner "traveled on foot", (2) the ticket was issued "during the approximate time frame of the Ragland murder," and (3) a "female passenger" in the vehicle "could have testified that she and the petitioner were together continuously for several hours prior to the stop" (Pet. Reply at 1-2).  Respondent states that it was "aware that Stewart received a summons approximately one hour after the murder while driving northbound on a one-way street that ended at the Murphy Houses where he lived," but that the summons was consistent with the evidence presented at trial, because it suggested that petitioner was returning from the diner where he had received payment for the murder (Letter to the Hon. Loretta A. Preska from Harry A. Chernoff, Esq., dated Mar. 17, 2009 (undocketed)("Resp. Letter"), at 3).  Respondent argues that because the traffic ticket supported the prosecution's case, trial counsel's decision not to offer it as evidence was strategic (Resp. Letter at 3).

I take judicial notice of the fact that the Murphy Consolidated State Houses, located at 1805 Crotona Avenue Bronx, New York, are within three miles of the John Adams Houses, located at 731 Tinton Avenue, Bronx, New York, and within two miles of the Crown Donuts Restaurant, located at 79 East 161st

18

Street, Bronx, New York.  Given these facts, it is clear that if
petitioner received a traffic ticket near the Murphy Consolidated
State Houses during the "approximate time frame" of the murder,
such evidence would have been inculpatory, because it would have
placed petitioner within three miles of the murder scene shortly
after the murder was committed.  The failure of petitioner's
trial counsel to offer such inculpatory evidence simply cannot be
ineffective assistance of counsel; rather, it is exactly the kind
of "sound trial strategy" that Strickland protects.  Strickland
v. Washington, supra, 466 U.S. at 689.

        With respect to the "female passenger" who petitioner
claims would have offered alibi testimony, petitioner has failed
to provide a supporting affidavit, or even the name, of this
individual.  Without such evidence, his claim that she would have
offered exculpatory testimony is entirely speculative.  See Ortiz
v. Artus, 06 Civ. 6444 (DAB)(JCF), 2008 WL 2369218 at *7
(S.D.N.Y. June 9, 2008) (Francis, M.J.) report and recommendation
adopted, 2010 WL 3238994 (S.D.N.Y. Aug. 11, 2010) (Batts, D.J.);
see also Mallet v. Miller, 432 F. Supp. 2d 366, 388 (S.D.N.Y.
2006) (Marrero, D.J.)("It is too easy for a defendant to claim
after the fact, without supporting evidence, that he provided
leads and information to his counsel that would have resulted in
his exoneration if used.").  However, even if petitioner's

alleged passenger had been identified, "the decision to call or bypass particular witnesses is peculiarly a question of trial strategy . . . which courts will practically never second-guess." United States ex rel. Walker v. Henderson, 492 F.2d 1311, 1314 (2d Cir. 1974), citing United States v. Matalon, 445 F.2d 1215, 1219 (2d Cir. 1971), and United States v. Garguilo, 324 F.2d 795, 797 (2d Cir. 1963).

Thus, for all the foregoing reasons, I conclude that petitioner's trial counsel was not ineffective for failing to investigate and offer evidence to the alleged traffic ticket, and that a supplemental evidentiary hearing is not required.

iii. Evidence of Other
     Suspects and the
     Murder Weapon

Petitioner next argues that a private investigator informed his trial counsel that "police had identified several other persons as suspects in the Ragland murder," and that "police arrested another person in possession of the firearm that was used to kill Ragland," and failed to present evidence of either of these facts to the jury (Pet. Amend. at 1). Petitioner further states that a private investigator would corroborate these claims at an evidentiary hearing (Petitioner's Reply to Government's Responsive Pleading Of March 17, 2009, dated Mar.

31, 2009 (Docket Item 83 in 02 Cr. 297)("Pet. Reply"), at 2).[5]
Neither of petitioner's arguments is persuasive.

Petitioner does little more than make conclusory
statements that certain evidence exists, and that such evidence
was not offered at trial.  He offers no explanation or details
regarding how such evidence would have benefited him, or why the
failure of his trial counsel to introduce such evidence preju-
diced him.  Given that the exculpatory value of the evidence to
which petitioner alludes is hardly self-evident, such omissions
are telling.

However, even I assume such evidence existed, and that
petitioner's trial counsel exhibited deficient performance in not
offering it, petitioner is unable to demonstrate that he was

_____

[5] With respect to other suspects, respondent states that it
is "unaware of a basis for the claim that the police had
identified several other 'suspects' in the Ragland murder," and
that "no other arrests were ever made" (Resp. Letter at 3).
Respondent further states that the trial testimony of several law
enforcement officers established that "the investigation of
Ragland's murder immediately focused on Ragland's narcotics
rivals across the avenue, the Westchester Avenue Crew" (Resp.
Letter at 4).  Similarly, with respect to the murder weapon,
respondent states that it is "unaware that any person was ever
arrested in possession of the murder weapon, or of any evidence
that the murder weapon was every conclusively identified" (Resp.
Letter at 4).  Respondent adds that even if another individual
was later arrested with the murder weapon in his possession, "it
would have done little to aid [petitioner] at trial," since
"[w]hether [petitioner] disposed of the murder weapon carefully
or carelessly" was not a crucial evidentiary point (Resp. Letter
at 4).

prejudiced given the overwhelming evidence of his guilt.  "Even
serious errors by counsel do not warrant granting habeas relief
where the conviction is supported by overwhelming evidence of
guilt."  Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001);
see Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005);
Alexander v. Connell, 10 Civ. 6658 (NRB), 2012 WL 3249415 at *10
(S.D.N.Y. Aug. 3, 2012) (Buchwald, D.J.); Baskerville v.
Dennison, 04 Civ. 10261 (PKC), 2005 WL 3535067 at *12 (S.D.N.Y.
Dec. 27, 2005) (Castel, D.J.); see also Strickland v. Washington,
supra, 466 U.S. at 696 ("[A] verdict or conclusion only weakly
supported by the record is more likely to have been affected by
errors than one with overwhelming record support.").  Here,
Benton and Farias, conspirators of petitioner, offered detailed
testimony regarding the events leading up to Ragland's murder as
well as eyewitness testimony of petitioner receiving payment for
the murder.  Barragan, another conspirator, testified that Gonza-
lez, the leader of the Westchester Avenue Crew, told him that
petitioner committed the murder, a fact that petitioner later
admitted to Barragan himself when the two met while incarcerated.

          In short, in light of the weight of the prosecution's
evidence, there is no reasonable probability that had
petitioner's trial counsel offered evidence of other suspects or
the fact that the murder weapon was later recovered from another

individual, it would have created a reasonable doubt with respect to petitioner's guilt.  See Bridges v. United States, 04 Civ. 2715 (HB), 2005 WL 1798084 at *4 (S.D.N.Y. Aug. 1, 2005) (Baer, D.J.) (no prejudice where petitioner proffered no proof of alleged alibis and substantial evidence indicated the verdict would not have been different had petitioner's counsel investigated potential alibi witnesses); Kanani v. Phillips, 03 Civ. 2534 (PKC)(AJP), 2004 WL 2296128 at *32 (S.D.N.Y. Oct. 13, 2004) (Peck, M.J.)(Report and Recommendation), report and recommendation adopted, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005) (Castel, D.J.) ("[D]ue to the overwhelming evidence of [petitioner's] guilt, it is unlikely that additional investigation would have affected the outcome of the trial." (citations omitted)); Rodriguez v. Senkowski, 03 Civ. 3314 (LAP)(AJP), 2004 WL 503451 at *41 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.) (Report and Recommendation) ("[I]n light of the extremely strong evidence against [petitioner] . . . any deficiency by counsel still would not satisfy the second Strickland prong[ ] of showing that [petitioner] was prejudiced.").  Therefore, because petitioner was not prejudiced by trial counsel's alleged deficiencies, this aspect of his ineffective assistance of counsel claim must fail, and no further evidentiary hearing is required.

iv.  Petitioner's
Plea Options

Petitioner next argues that trial counsel failed to explain the benefits of accepting the government's plea offer, which would allegedly have resulted in a "20 to 30" year sentence,[6] versus his likelihood of acquittal at trial (Petition at 5C-5D).  Petitioner states that when he asked trial counsel about the government's offer, trial counsel "responded that he could not give the petitioner a fair assessment of the government's offer because he needed more time to review 3500 material in the case" (Petition at 5C-5D).  Petitioner further states that had trial counsel explained the risks of proceeding to trial versus his likelihood of acquittal, he would have accepted the government's offer (Petition at 5C-5D).  This argument is fundamentally deficient.

The Sixth Amendment right to the effective assistance of counsel extends to the plea bargaining process.  Lafler v. Cooper, --- U.S. ---, ---, 132 S. Ct. 1376, 1384 (2012); Missouri v. Frye, --- U.S. ---, ---, 132 S. Ct. 1399, 1405 (2012).

_____

[6] According to respondent,"[t]he Government's plea offer, made directly to the [petititoner] in a reverse proffer well in advance of trial, was 35 years" (Resp. Memo. at 31).

In order for a defendant to demonstrate prejudice in the context of a claim of ineffective assistance resulting in the rejection of a plea offer,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Assadourian v. Brown, 493 F. App'x 223, 224 (2d Cir. 2012),

quoting Lafler v. Cooper, supra, 132 S.Ct. at 1385.

In the context of a defense counsel's advice surrounding a plea offer, "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000) (internal quotation marks omitted) (quoting Model Rules of Professional Conduct Rule 1.4(b) (1995)). "The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case . . . [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision." Boria v. Keane, 99 F.3d 492, 496-97 (2d Cir. 1996) (internal quotation marks omitted) (quoting Anthony G. Amsterdam, Trial Manual 5 for the Defense of Criminal Cases (1988)), cert. denied, Keane v. Boria, 521 U.S. 1118, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997). "As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy, 208 F.3d at 45 (internal citations omitted). "[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea

> offer will often be crucial to the decision whether to
> plead guilty." U.S. v. Gordon, 156 F.3d 376, 380 (2d
> Cir. 1998) (per curiam) (citation and internal quota-
> tion marks omitted).

Carrion v. Smith, 365 F. App'x 278, 281-82 (2d Cir. 2010).

> "[A] defendant's self-serving, post-conviction testi-
> mony regarding his intent with respect to a plea offer"
> is insufficient by itself "to establish a 'reasonable
> probability' that he or she would have accepted the
> plea agreement," and thus "requires some further
> 'objective evidence' that a petitioner would have ac-
> cepted a plea offer."

Shi Yong Wei v. United States, 11 CIV. 6961 (RMB), 2013 WL 980151

at *5 (S.D.N.Y. Mar. 12, 2013) (Berman, D.J.), quoting United

States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998).

Here, petitioner does not claim that his trial counsel

failed to inform him of the government's plea offer, or that he

was given erroneous advice; rather, he claims is only that he was

not given enough advice. However, this argument, like many of

petitioner's other claims, is articulated in highly vague and

conclusory terms. Petitioner does not state when his trial

counsel informed him that he could not give him a "fair assess-

ment." He does not state whether there were any other conversa-

tions between him and trial counsel regarding the government's

plea offer, particularly, whether the topic was raised again

after counsel had finished reviewing the Jencks Act material. He

does not state that he was seriously considering the government's

offer or whether he ever desired to make a counter-offer.  He
does not even state that he was unaware of the potential sentenc-
ing exposure he faced if convicted of the charges.  In short,
petitioner offers virtually no evidence his trial counsel's
performance was deficient.  Conclusory allegations such as these
are hardly enough to overcome Strickland's strong presumption
that counsel performs competently.  See Strickland v. Washington,
supra, 466 U.S. at 669.

However, even if I assume, arguendo, that petitioner is
able to satisfy the deficiency prong of Strickland, he is still
unable to demonstrate that there is a reasonably probability he
would have accepted the government's plea offer.  "[I]t is
well-settled that the second prong of Strickland, a formidable
but-for test of prejudice, requires some further objective evi-
dence beyond a petitioner's 'self-serving, post-conviction testi-
mony.'"  Bhindar v. United States, 11 Civ. 3911 (LAP), 2013 WL
171084 at *5 (S.D.N.Y. Jan. 16, 2013) (Preska, D.J.), quoting
United States v. Gordon, supra, 156 F.3d at 380-81.  While it is
true that the Second Circuit has held that "[a] significant
sentencing disparity between what is provided for under a plea
agreement and the sentence imposed after trial, in combination
with defendant's statement of his intention that he would have
pled guilty is sufficient to support a prejudice finding," Car-

27

rion v. Smith, supra, 365 F. App'x at 281-82 (internal modifica-
tions omitted), petitioner does not even raise this argument, and
provides no other objective evidence in support of his claim.
Indeed, the only objective evidence available, seems to suggest
that petitioner would not have pled guilty, even if he had been
given the advice he now claims was lacking.  Petitioner expressed
optimism during a recorded telephone call made while he was
detained awaiting trial, stating that he intended to "beat" the
charges at trial (Tr. 1255-56).  Petitioner also maintained his
innocence throughout the proceedings, and continues to do so
presently, further undercutting his claim that a guilty plea
would have been acceptable to him.  See Page v. Martuscello, 10
Civ. 9699 (JSR)(AJP), 2011 WL 3678820 at *28 (S.D.N.Y. Aug. 23,
2011) (Peck, M.J.) report and recommendation adopted, 10 Civ.
9699 (JSR), 2013 WL 1092825 (S.D.N.Y. Mar. 15, 2013) (Rakoff,
D.J.); Bennett v. Mosicicki, 09-CV-06608T, 2011 WL 2436666 at *7
(W.D.N.Y. June 14, 2011); Custodio v. United States, 945 F. Supp.
575, 579 (S.D.N.Y. 1996) (Sprizzo, D.J.).  Given the fact that
petitioner, who was in his twenties[7] at the time of trial, faced a
sentence of 35 years under the plea offer, it is not unreasonable

---

[7] Special Agent Mercurio testified that petitioner was
"roughly 26" years old when he filled out post-arrest paperwork
on September 27, 2004 (Tr. 712).

to conclude that he decided to take his chances and proceed to trial, a decision he is now attempting to undo with the benefit of hindsight.

Thus, for the reasons stated above, I conclude that this aspect of petitioner's ineffective assistance of counsel claims lacks merit, and no further evidentiary hearing is required.

b.   Appellate Counsel's
Alleged Ineffectiveness

Petitioner also raises four arguments in support of his claim that his appellate counsel was ineffective.[8]  The first three arguments are predicated on objections that were made by trial counsel, overruled by the Trial Court, and subsequently abandoned on appeal.  The fourth argument concerns appellate counsel's failure to file a petition for a writ of certiorari. For the reasons stated below, none of petitioner's arguments are meritorious, nor does petitioner even attempt to demonstrate why any of the arguments that his appellate counsel failed to raise are clearly stronger than those that were in fact raised.  See Larrabee v. Smith, supra, 14 F.Supp.2d at 239.

---

[8] Petitioner initially raised an additional argument concerning double jeopardy (Petition at 5B-5C), but has since withdrawn it (Pet. Reply at 1).

i.    Trial Counsel's
<u>Continuance Request</u>

Petitioner's first claim that his appellate counsel was
ineffective stems from appellate counsel's failure to argue that
the Trial Court erroneously denied a request for a continuance
(Petition at 5A).

On January 30, 2006, just prior to <u>voir dire</u>, peti-
tioner's trial counsel made an oral application for a "very
brief" adjournment, arguing that a superseding indictment re-
turned on January 24, 2006 altered the prosecution's trial theory
(Tr. 8-14).  In essence, petitioner's trial counsel argued that
the "to wit" clause the prior indictment alleged that petitioner
was the shooter, while the superseding indictment allowed the
prosecution to proceed on an aiding and abetting theory as well
(Tr. 8-14).  The prosecution responded that it "need not prove
that [petitioner] was the actual shooter to convict him of [the]
charges," and that they "assume[d] that the defense had to have
been aware the entire time that -- this case has been pending for
more than two years -- that the government would not have to
prove the [petitioner] was the shooter to convict him" (Tr. 6,
12).  Nevertheless, the prosecution stated that it would be
making "every effort at this trial to prove that the [petitioner]

was the shooter" (Tr. 11).  The Trial Court denied the applica-
tion for a continuance, stating:

> We all agree that the government would not have to
> prove the to-wit clause.  The government apparently
> is telling us that it has not changed its theory of the
> case and its theory the case remains that [peti-
> tioner] was the shooter.  And it remains the fact that
> from the last most, the penultimate indictment, that
> the government would not have to prove that the defen-
> dant was the shooter.  So I can't understand what has
> changed, other than the clarity of the to-wit clause.
> And for that reason, find a continuance is not required
> here.

(Tr. 14).

Petitioner argues that, contrary to its representation
to the Trial Court, "the government presented testimony that the
petitioner aided and abetted the shooter by acting as the getaway
driver" (Petition at 5A).  He cites as an example the following
testimony from his trial, which took place during the direct
examination of Barragan:

> [Prosecution]: What did the [petitioner] say he actu-
> ally did with respect to [Ragland]?
>
> [Barragan]:   He said that he got an individual to
> take care of it, but he – he was telling
> me he was the driver.
>
> [ . . . ]
>
> [Prosecution]: So the [petitioner] claimed he got some-
> one who had -- who was about to go to
> jail himself actually do the shooting?
>
> [Barragan]:   Yes.

31

```
[Prosecution]:    And to make it clear, what did [peti-
                  tioner] claim that [petitioner] himself
                  did at the actual shooting?

[Barragan]:       He said that he was the driver.  And
                  that he set up the -- the -- he showed
                  the guy, the shooter, the shooter the
                  person, who he was, and he drove him
                  away.
```

(Tr. 191-92).  Petitioner's argument is without merit.

      A judge's decision not to grant a continuance is a
discretionary one, and does not in itself violate a
defendant's constitutional rights; the Supreme Court
has recognized, however, that an "unreasoning and arbi-
trary" denial of a continuance may violate a defen-
dant's due process rights to a fair trial and to pres-
ent a defense or the right to assistance of counsel.
Morris v. Slappy, 461 U.S. 1, 11, 103 S.Ct. 1610, 75
L.Ed.2d 610 (1983); see also Ungar v. Sarafite, 376
U.S. 575, 584, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964);
Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 84
L.Ed. 377 (1940).  The Supreme Court has identified
several factors to consider in determining whether a
denial of a continuance is an abuse of discretion,
including the judge's reasons for denying the continu-
ance, the arguments made to the judge in support of the
continuance, the diligence of the defendant in request-
ing the continuance, and the degree to which the denial
of the continuance ultimately prejudiced the defendant.

Marrant v. Cuomo, 447 F. App'x 234, 235-36 (2d Cir. 2011); see

also United States v. Sehgal, 480 F. App'x 16, 19 (2d Cir. 2012),

quoting Sanusi v. Gonzales, 445 F.3d 193, 199 (2d Cir. 2006)

("Trial courts enjoy 'largely unfettered' discretion in granting

or denying trial continuances.").

      Here, employing the factors identified by the Supreme

Court above, it simply cannot be said that the Trial Court's

denial of petitioner's request for a continuance was "unreasoning and arbitrary," or an abuse of discretion.  The short duration of the continuance sought by petitioner's trial counsel, for "two session days" (Tr. 14), in conjunction with petitioner's failure to explain how his counsel would have used the continuance, suggests that it was sought for convenience rather than necessity, and that its absence did not prevent trial counsel from mounting a vigorous defense.  The prosecution's position, that the modifications to the to-wit clauses were done only to "avoid jury confusion" by "more closely track[ing] the language of the statutes" (Tr. 6) was credible.  Finally, as the Trial Court observed, the changes to the indictment were contained within "to wit" clauses, which the prosecution would never have had to prove.  It is for this reason, in particular, that petitioner cannot demonstrate prejudice; given the nature of the charges, he could have been convicted on an aiding abetting theory under the prior indictment.

Thus, because the Trial Court's denial of a continuance was not an abuse of discretion and petitioner's appellate counsel was not ineffective for failing to raise the issue on appeal. Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) ("The failure to include a meritless argument does not fall outside the 'wide

range of professionally competent assistance' to which Petitioner was entitled.").

ii.   Trial Counsel's
<u>Hearsay Objection</u>

Petitioner next argues that appellate counsel improperly failed to argue that certain trial testimony of Barragan was inadmissible hearsay (Petition at 5A-5B).

The testimony on which petitioner predicates this argument concerns a conversation between Barragan and Gonzales that took place while Barragan was in state custody:

> [Prosecution]: Now, did there come a time while you were in state custody that you learned that a rival to the group had been killed?
>
> [Barragan]:    Yes.
>
> [Prosecution]: Who told you that first?
>
> [Barragan]:    Gammy Gonzalez.
>
> [Prosecution]: And in that conversation did you learn the identity of one of the people who participated in that murder?
>
> [Barragan]:    Yes.
>
> [Prosecution]: Who was that person?
>
> [Barragan]:    An individual by the name of Damoo.[9]

---

[9] "Damoo" was petitioner's nickname (Tr. 843-45).

```
          [Prosecution]: Did --

          [Defense]:     Objection, your Honor.  Hearsay based on
                         foundation at this point, your Honor.

          The Court:     Mr. Jaffe?

          [Prosecution]: Does your Honor require a further foun-
                         dation at this point in time?  I can
                         elicit it.

          The Court:     Go ahead.
```

(Tr. 91).  The prosecution then proceeded to elicit testimony

from Barragan concerning the ongoing nature of the Westchester

Avenue Crew's operations, and that at the time the conversation

took place, Barragan had a continuing advisory role (Tr. 91-93).

Petitioner's trial counsel made no further hearsay objection.

Petitioner argues that his appellate counsel should

have known "that it was error to allow a cooperating witness to

give hearsay testimony that [a] deceased co-conspirator told him

that petitioner killed someone for his crew" and that the state-

ment was "merely idle chatter or a narrative description of past

events" (Petition at 5A-5B).  Petitioner's argument is unpersua-

sive.

          Under Federal Rule of Evidence 801(d)(2)(E), a
          statement that would otherwise be inadmissible hearsay
          may be admitted if it "is offered against an opposing
          party and was made by the party's coconspirator during
          the course of and in furtherance of the conspiracy."
          To admit a statement under this coconspirator excep-
          tion, "a district court must find two factors by a
          preponderance of the evidence:  first, that a conspir-

                              35

> acy existed that included the defendant and the
> declarant; and second, that the statement was made
> during the course of and in furtherance of that con-
> spiracy." United States v. Gigante, 166 F.3d 75, 82
> (2d Cir. 1999). A statement is "in furtherance of a
> conspiracy" if it was "in some way . . . designed to
> promote or facilitate achievement of the goals of that
> conspiracy, as by, for example, . . . communicating
> with a person who is not a member of the conspiracy in
> a way that is designed to help the coconspirators to
> achieve the conspiracy's goals." United States v.
> Rivera, 22 F.3d 430, 436 (2d Cir. 1994).

United States v. Graham, 477 F. App'x 818, 822 (2d Cir. 2012)

cert. denied, 133 S. Ct. 349 (U.S. 2012). "To be in furtherance

of the conspiracy, a statement must be more than 'a merely narra-

tive' description by one co-conspirator of the acts of another."

United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d

Cir. 1999). "While statements that are merely 'idle chatter' or

that are 'entirely retrospective' are not in furtherance of the

conspiracy, statements relating past events meet the

in-furtherance test if they serve some current purpose in the

conspiracy, such as to 'promote [ ] cohesiveness,' or to provide

reassurance to a coconspirator." United States v. Thai, 29 F.3d

785, 813 (2d Cir. 1994) (internal citations omitted).

Here, Gonzalez's statement to Barragan fits squarely

within the hearsay exception articulated in Federal Rule of

Evidence 801(d)(2)(E). Gonzalez, the declarant, was one of the

leaders of the Westchester Avenue Crew, and the individual that

hired petitioner to kill Ragland.  He was communicating with Barragan, another leader of the Westchester Avenue Crew (Tr. 91). The communication took place while Barragan was incarcerated, during which time he continued to "advis[e] the group about matters related to narcotics trafficking" and received illicit gains from ongoing conspiracy-related drug sales (Tr. 92-93). Finally, the substance of the communication, which concerned the elimination of a threat to the drug operation, could hardly have been more integrally related to the illegal, ongoing aims of the conspiracy.  Because the statement was clearly made in further-ance of the conspiracy, appellate counsel was not ineffective for failing to challenge its admission.

### iii. Michelle Farias's Cross-Examination

Petitioner next argues that appellate counsel was ineffective on the following ground:

> Trial counsel argued at trial that it was error to restrict his cross-examination of cooperating witness Michelle [Farias] regarding the defense position that [Farias] hoped her lover, another cooperating witness (Jerald Benton) benefited from her cooperation.  Appel-late counsel reasonably should have known that this was a meritorious issue.

(Petition at 5B (internal citation omitted)).  Petitioner's argument is baseless and premised on a mischaracterization of the record.

        During the cross-examination of Farias, petitioner's trial counsel sought to inquire concerning Farias's romantic relationship with fellow cooperating witness Benton, ostensibly to show her bias:

> [Defense]:     Now, in the letters, at least in the letters that the government showed you, you expressed your love for Mr. Benton, correct?
>
> [Farias]:      I expressed my love for Mr. Benton in every letter I wrote him.
>
> [Defense]:     And you also expressed to Mr. Benton that it was your understanding that he would be home in a year, correct?
>
> [Farias]:      I don't remember specifically what I wrote to [Benton].

(Tr. 462).  Petitioner's trial counsel requested a side bar to discuss whether he could attempt to refresh Farias's recollection with respect to the letter in which she wrote to Benton that "he would be home in a year" (Tr. 462-64).  The prosecution objected, arguing that rather than properly attempting to demonstrate bias, petitioner's trial counsel was improperly "trying to suggest that Ms. Farias has some inside knowledge that her defense attorney told her that she and Mr. Benton will all be home within a year

as soon as this trial is over" (Tr. 466).  Asked by the court
what the relevance of "what [Farias] hopes for [Benton]" would
be, petitioner's trial counsel stated

> The same relevance as to what she hopes for her-
> self.  Expectations are always fair game.  I mean, this
> is her lover.  They are codefendants and they're lovers
> and they are both cooperating witnesses who are doing
> things they shouldn't be doing, which is, namely, com-
> municating with each other.  If part of the defense
> theory is that these folks have colluded, then that's
> an important part of our defense.

(Tr. 467).  The Court remarked that Farias had "already admitted
her bias," and further stated that "[o]n the issue of bias, this
statement or the statement 'I hope you will be out in a year' has
very little probative value" (Tr. 467).

Contrary to petitioner's argument, the above-quoted
colloquy does not demonstrate that the Trial Court restricted the
defense from presenting its theory that Farias thought Benton
would benefit from her cooperation; rather, the Trial Court's
ruling concerned only the narrower issue of whether certain
letters could be used to refresh Farias's recollection.  In fact,
following the colloquy, trial counsel continued to pursue the
very theory that petitioner states he was prevented from pursu-
ing, with no objection from the prosecution.[10]

---

[10]   [Defense]:   Would it be a fair statement, Ms.
                    Farias, to say that you thought it would
                                              (continued...)

However, even assuming that the Trial Court's ruling restricted petitioner's defense in the way petitioner suggests, such a restriction cannot be shown to have caused him prejudice. As the Trial Court correctly observed, trial counsel had already effectively demonstrated "bias squared" by eliciting testimony from Farias regarding her relationship with Benton (Tr. 467). Thus, eliciting further testimony regarding Farias's alleged hope that her cooperation would somehow benefit Benton would not have been probative of any bias that had not already been thoroughly demonstrated.

Because this issue was not meritorious, petitioner's appellate counsel was not ineffective in deciding not to raise it on appeal.

> iv.   Petition for
>       Writ of Certiorari

Finally, petitioner argues that his appellate counsel was ineffective for failing to file a petition for a writ of

---

[10](...continued)

| | |
|---|---|
| | be in the best interest of both you and Mr. Benton to cooperate with the prosecution, correct? |
| [Farias]: | No, I knew it was in my best interest. I just wanted Jerald to be able to go home soon. |

(Tr. 470).

certiorari to the United States Supreme Court (Pet. Amend. at 2).
This argument is meritless.  Because there is no constitutional
right to counsel for filing a petition for a writ of certiorari,
a claim for ineffective assistance of counsel cannot be predi-
cated on the failure of counsel to do so.[11]  See
Delacruz v. United States, 92 Civ. 4445 (RJW), 1992 WL 212318
(S.D.N.Y. Aug. 27, 1992) (Ward, D.J.).

IV.  Conclusion

        For the foregoing reasons, I respectfully recommend
that petitioner's petition to vacate, set aside or correct his
sentence be denied in its entirety.  I further recommend that all
other pending motions be closed as moot.

        In addition, because petitioner has not made a substan-
tial showing of the denial of a constitutional right, I also
recommend that a certificate of appealability not be issued.  28

---

        [11] Respondent has also supplied an affidavit from
petitioner's appellate counsel, in which appellate counsel states
that he advised petitioner that he was willing to file a petition
for certiorari on his behalf, but that such a petition "stood
virtually no chance of success" (Affirmation of James E. Neuman,
Esq., dated March 17, 2009, annexed to Resp. Letter, at ¶¶ 2-3).
Appellate counsel further states that petitioner told him that
"he did not want me to file the petition if I considered it
pointless"; after appellate counsel advised petitioner to think
about the matter further, petitioner made no further contact
(Neuman Aff. at ¶ 4).

U.S.C. § 2253.  To warrant the issuance of a certificate of appealability, "petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Middleton v. Attorneys Gen., 396 F.3d 207, 209 (2d Cir. 2005) (per curiam) (citation and internal quotation marks omitted); see also Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005) (per curiam).  For the reasons set forth above, I conclude that there would be no dif-ference of opinion among reasonable jurists that petitioner's federal rights were not violated.

I further recommend that certification pursuant to 28 U.S.C. § 1915(a)(3) not be issued because any appeal from this Report and Recommendation, or any Order entered thereon, would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court,

with courtesy copies delivered to the Chambers of the Honorable Richard Owen, United States District Judge, 500 Pearl Street, Room 650, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Owen. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-238 (2d Cir. 1983).

Dated:  New York, New York
        May 7, 2013

                              Respectfully submitted,


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:

Mr. Antoine Stewart
Reg. No. 54265-054
U.S. Penitentiary
Lewisburg, Pennsylvania  17837

Harry Chernoff, Esq.
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, New York  10007